IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-21

No. 3A21

Filed 11 March 2022

IN THE MATTER OF FRANK LENNANE, Petitioner

ADT, LLC, Employer

and

NORTH CAROLINA DEPARTMENT OF COMMERCE, DIVISION OF EMPLOYMENT SECURITY, Respondent

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 274 N.C. App. 367 (2020), affirming an order entered on 17 February 2020 by Judge W. Robert Bell in Superior Court, Haywood County. Heard in the Supreme Court on 6 January 2022.

*Legal Aid of North Carolina, Inc., by Joseph Franklin Chilton, Cindy M. Patton, John R. Keller, and Celia Pistolis, for petitioner-appellant.*

*North Carolina Department of Commerce, Division of Employment Security, by Elias W. Admassu, R. Glen Peterson, and Sharon A. Johnston, for respondent-appellee.*

BARRINGER, Justice.

¶ 1    In this case, we consider whether to uphold the determination that petitioner Frank Lennane is disqualified from receiving unemployment benefits. To guide the interpretation and application of unemployment benefits under Chapter 96 of the General Statutes of North Carolina, the legislature has declared the public policy of

this State for nearly ninety years as the following:

> Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this State. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the Legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. The achievement of social security requires protection against this greatest hazard of our economic life. This can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The Legislature, therefore, declares that in its considered judgment the public good and the general welfare of the citizens of this State require the enactment of this measure, under the police powers of the State, for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own.

Unemployment Compensation Law, ch. 1, sec. 2, 1936 N.C. Pub. [Sess.] Laws (Extra Sess. 1936) 1, 1 (codified at N.C.G.S. § 96-2 (2021)).

¶ 2        This declaration guides our analysis of the issue before us: whether Lennane's leaving work was attributable to his employer as required by N.C.G.S. § 96-14.5(a) to avoid disqualification for unemployment benefits. *See* N.C.G.S. § 96-2. Having considered the legislature's declared public policy, the plain language of the applicable statute, and the binding findings of fact, we conclude that Lennane failed to show that his leaving work was attributable to his employer as required by

N.C.G.S. § 96-14.5(a).

## I.  Background

Lennane left work on 16 November 2018. Lennane filed an initial claim for unemployment benefits on 11 November 2018. An adjudicator held Lennane disqualified for benefits, and Lennane appealed. Thereafter, an appeals referee conducted a hearing on the matter. The appeals referee affirmed the prior decision and ruled that Lennane was disqualified for unemployment benefits because he failed to show good cause attributable to the employer for leaving as required by N.C.G.S. § 96-14.5(a). Lennane then appealed to the Board of Review for the North Carolina Department of Commerce. The Board of Review adopted the appeals referee's findings of fact as its own and concluded that the appeals referee's decision was in accord with the law and the facts. Accordingly, the Board of Review affirmed the appeals referee's decision. Lennane next appealed to the superior court, which affirmed the Board of Review's decision. Lennane then appealed to the Court of Appeals.

A divided panel of the Court of Appeals affirmed the superior court's order. *In re Lennane*, 274 N.C. App. 367, 372 (2020). When considering whether the superior court erred by affirming the Board of Review's determination, the Court of Appeals compared this case with the Court of Appeals decision in *Ray v. Broyhill Furniture Industries*, 81 N.C. App. 586 (1986). *In re Lennane*, 274 N.C. App. at 370. In *Ray*, the

Court of Appeals "held that the claimant proved her reason for leaving was attributable both to the employer's action (the threat to fire her if she went over her supervisor's head) and inaction (her supervisor's failure to put in her transfer request)." *Id.* (cleaned up). Unlike *Ray*, the Court of Appeals explained that, in this case, the employer acted to help Lennane. *Id.*

The Court of Appeals then considered whether competent evidence supported the challenged findings of fact and whether those findings of fact supported the conclusion of law. *Id.* at 370–72. The Court of Appeals concluded that competent evidence supported the challenged findings of fact and that the findings of fact supported the conclusion that Lennane "failed to establish that his good cause for leaving work was attributable to the employer." *Id.* at 372 (cleaned up).

To the contrary, the dissent contended that:

> It is not [Lennane]'s fault that his knee suffers from osteoarthritis, nor is it his fault that his employer's "business needs" precluded accommodations that would not require him to sacrifice his health. He was thus rendered "unemployed through no fault of [his] own[,]" N.C. Gen. Stat. § 96-2.

*Id.* at 373 (Inman, J., dissenting) (second and third alterations in original).

According to the dissent, like in *Ray*, Lennane's employer's inaction "placed [him] in the untenable position of having to choose between leaving [his] job and becoming unemployed or remaining in a job which . . . exacerbated [his medical] conditions." *Id.* (alterations in original) (quoting *Ray*, 81 N.C. App. at 592–93). Thus,

the dissent, relying on N.C.G.S. § 96-2 and *Ray*, would have held that Lennane left work for good cause attributable to the employer. *Id.* The dissent disagreed with the majority's conclusion of law but did not identify any findings of fact as being unsupported by competent evidence. *Id.* at 372–73.

Lennane appealed based on the dissenting opinion. Accordingly, we now consider the issue Lennane identified as distinguishing the majority and dissenting opinions: "whether his leaving was attributable to the employer."

## II. Standard of Review

"The standard of review in appeals from the [Department of Commerce, Division of Employment Security], both to the superior court and to the appellate division, is established by statute." *Binney v. Banner Therapy Prods., Inc.*, 362 N.C. 310, 315 (2008). In these judicial proceedings, "the findings of fact by the Division, if there is any competent evidence to support them and in the absence of fraud, shall be conclusive, and the jurisdiction of the court shall be confined to questions of law." N.C.G.S. § 96-15(i) (2021); *see also* N.C.G.S. § 96-15(h) (establishing procedure for judicial review of a decision of the Board of Review); *Binney*, 362 N.C. at 315. When no challenge to a finding of fact is made, an appellate court presumes that the finding of fact is supported by the evidence, and the finding of fact is binding on appeal. *See, e.g., Carolina Power & Light Co. v. Emp. Sec. Comm'n of N.C.*, 363 N.C. 562, 564 (2009); *State ex rel. Emp. Sec. Comm'n v. Jarrell*, 231 N.C. 381, 384 (1950). We review

de novo whether the Division's findings of fact support the conclusions of law. *Carolina Power*, 363 N.C. at 564.

### III.  Analysis

¶ 10    Article 2C of Chapter 96 of the North Carolina General Statutes sets forth when benefits are payable for unemployment and when an individual is disqualified from receiving benefits. N.C.G.S. §§ 96-14.1 to -14.16 (2021). As relevant to this appeal, subsection 96-14.5(a) mandates that "[a]n individual does not have a right to benefits and is disqualified from receiving benefits if the Division determines that the individual left work for a reason other than good cause attributable to the employer." N.C.G.S. § 96-14.5(a). "When an individual leaves work, the burden of showing good cause attributable to the employer rests on the individual and the burden may not be shifted to the employer." N.C.G.S. § 96-14.5(a). Good cause exists when an individual's "reason for [leaving] would be deemed by reasonable men and women valid and not indicative of an unwillingness to work." *In re Watson*, 273 N.C. 629, 635 (1968). "A separation is attributable to the employer if it was produced, caused, created or as a result of actions by the employer." *Carolina Power*, 363 N.C. at 565 (cleaned up).

¶ 11    Since the Division conceded on appeal that Lennane had good cause to leave work, the only question before us is whether the findings of fact support the conclusion of law that Lennane's leaving work was not attributable to his employer.

*See* N.C.G.S. § 96-14.5(a). We cannot, as the Court of Appeals' dissent did, substitute our view of the evidence for the findings of fact before us. *See In re Lennane*, 274 N.C. App. at 373 (Inman, J., dissenting) (acknowledging the findings of fact concerning the employer's attempt to make accommodations but dismissing them based on the dissent's interpretation of the manager's testimony and making its own findings concerning the detriment to Lennane's health from performing the equipment installations, Lennane's ability to perform the number of installations required of him by his employer, and Lennane's fault).

¶ 12    All findings of fact by the Division are as follows:

> 1.    The claimant filed an initial claim for unemployment insurance benefits on November 11, 2018.
>
> 2.    The claimant last worked for ADT LLC on November 16, 2018 as a service technician.
>
> 3.    The Adjudicator issued a determination under Issue No. 1669952 holding the claimant disqualified for benefits. The claimant appealed. Pursuant to [N.C.]G.S. [§] 96-15(c), this matter came before Appeals Referee Stephen McCracken on August 7, 2019. Present for the hearing: Frank Lennane, claimant; Joseph Chilton, claimant representative; Randall Goodson, employer witness and installation/service manager; Stephanie Morgan, employer witness and administrative team leader; Michael Curtis, employer representative. The employer's representative participated in the hearing via teleconference following a written request to participate by telephone due to a travel distance of more than 40 miles to the hearing location. Neither parties were prejudiced by the hybrid hearing.

4.  The claimant was employed by the above-captioned employer from February 1, 2012 until November 16, 2018.

5.  As a service technician for the employer, the claimant conducted service calls to the employer's residential and commercial customers with security or business alarm systems. Generally, service calls only require a part/component replacement and, generally, do not require a significant amount of physical activity. Although, a service call sometimes required some ladder climbing and crawling.

6.  At times, the claimant had to perform residential and commercial security system and alarm system installations. Installations require more physical work, such as more drilling, climbing, and crawling, than a service call.

7.  The claimant was aware of his job duties and responsibilities and was trained to perform both service calls and installation jobs.

8.  In 2014, the claimant injured his left knee while on the job. Said injury caused the claimant to undergo surgery. Following the claimant's surgery, the claimant began to favor his right knee, which resulted in the claimant experiencing regular pain in his right knee. The claimant had a permanent partial disability in his left knee.

9.  The claimant kept the employer informed of his physical health conditions.

10. In 2016, service technicians began to perform installation jobs following a business merger and a merger of the employer's service and installation departments.

11. The claimant had difficulty performing installations due to the poor physical conditions of his knees, of which he notified his manager. The claimant asked his manager if there were other jobs, such as administrative or clerical work, that in which [sic] he could apply for or be placed.

12. The employer only had administrative positions in Spartanburg, South Carolina and Knoxville, Tennessee, and the claimant was unwilling to relocate from North Carolina.

13. In 2017, the claimant took a [five] week leave of absence via the Family and Medical Leave Act (FMLA) to rest his knees and seek additional medical intervention.

14. On or about September 5, 2017, the claimant returned to work from his medical leave. The claimant's doctor requested that the claimant not stand or walk for prolonged periods.

15. The claimant asked his manager, Randall Goodson, if he could only be assigned service calls due to the less strenuous nature of those jobs. The claimant's manager denied the claimant's request because he needed to keep a fair balance of work distribution among all of the service technicians.

16. However, the claimant's manager made attempts thereafter to not dispatch the claimant on the most strenuous or large installations.

17. If the claimant had to be dispatched on a large installation, then manager Goodson would try to ensure that he (claimant) had another service technician available to assist him.

18. In October 2018, the claimant had an appointment with a surgeon to discuss treatment for his knees. At

which time, the claimant was told that he could undergo surgery or stem cell therapy. The claimant was unwilling to undergo either options [sic].

19. As of November 2018, the claimant was continuing to fully perform his service technician job duties and responsibilities.

20. On or about November 8, 2018, the claimant notified the employer that he was resigning from employment because he was no longer able to perform his job due to the physical health condition of his knees.

21. Prior to the claimant's resignation, he did not make any formal or written requests for workplace accommodations from either the employer's administrative or human resources staff members. During 2018, the claimant did not request intermittent leave via FMLA.

22. The claimant left this job due to personal health or medical reasons.

23. At the time the claimant left, the employer did have continuing service technician work available for him.

¶ 13        Lennane argues that the findings of fact show that the employer's actions and inactions, not those of Lennane, caused him to leave work to protect his health. According to Lennane, the findings of fact show that his employer acted by changing his job duties by increasing the amount of installation work required for his position and failed to act by not implementing his request to only be assigned service calls. Lennane, like the dissent, advances the proposition that "*Ray* [c]ompels [a] [c]onclusion" that Lennane left work with good cause attributable to the employer.

Lennane also contends that his unwillingness to relocate for an administrative position with his employer cannot support the conclusion of law that he left work without good cause attributable to the employer and relies on the Court of Appeals' decision in *Watson v. Employment Security Commission of North Carolina*, 111 N.C. App. 410 (1993).

¶ 14        Admittedly, Lennane's employer modified the allocation of installation jobs to service technicians two years before Lennane left work, and Lennane had difficulty performing installations because of pain in his knees. However, the findings of fact do not support the causal link required by N.C.G.S. § 96.14.5(a) between the employer's action (change in allocation of installation work) or inaction (not ceding to Lennane's request) and Lennane's leaving.

¶ 15        Lennane has not shown that his allocation of installation jobs as modified by his employer in 2016 was more detrimental to his health than his prior duties and responsibilities. Before 2016, Lennane performed service calls as well as installations at times. Lennane's partial disability in his left knee and pain in his right knee predated the 2016 modification. In 2016, only the allocation of service calls and installations assigned to service technicians, like Lennane, changed. Although installations involved "more physical work, such as more drilling, climbing, and crawling, than a service call," Lennane's "doctor requested that [Lennane] not stand or walk for prolonged periods." There is no finding that the installations increased

the amount of prolonged standing and walking by Lennane relative to service calls. *See In re Lennane*, 274 N.C. App. at 370 ("[Lennane] provided no medical restrictions or limitations on bending, stooping, or crawling to [the e]mployer. The only medical request [Lennane] gave [the e]mployer was in September 2017 that he not stand or walk for prolonged periods."). Thus, we cannot conclude that the employer's action caused Lennane's leaving.

¶ 16       Despite our sympathy for those with health conditions, we cannot fill in the facts for Lennane. We only have the binding findings of facts properly before us, and the burden is on Lennane pursuant to N.C.G.S. § 96-14.5(a) to show good cause attributable to the employer. We also do not rely on *Barnes v. Singer Co.*, 324 N.C. 213 (1989). In *Barnes*, this Court imposed the burden on the employer and declined to address whether there was good cause attributable to the employer. *Id.* at 216, 217; *see also id.* at 219 (Meyer, J., dissenting) ("The burden should be upon the party who is in the best position to prove the matter in question. Here, it is the claimant who can best prove the crucial fact, not yet established in this case, that transportation to the new plant site is, in a practical sense, unavailable to her.").

¶ 17       Our legislature expressly placed on the individual the burden—that cannot be shifted to an employer—to show good cause attributable to the employer when the individual left work. *See* N.C.G.S. § 96-14.5(a). The goal sought by unemployment insurance is to avoid economic insecurity from involuntary unemployment. *See*

N.C.G.S. § 96-2. The legislature for nearly ninety years has recognized that this achievement "can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment." *Id.* Given the requirement of *attribution* to the employer under N.C.G.S. § 96-14.5(a), we must consider both an individual's and employer's efforts to preserve the employment relationship when assessing whether the individual's leaving is attributable to the employer. Consideration of these efforts is consistent also with the legislative purposes of "encouraging employers to provide more stable employment" and "prevent[ing] [the] spread [of involuntary unemployment.]" N.C.G.S. § 96-2. If we ignore the efforts of employer in the binding findings of fact, like the dissent, employers are not encouraged to provide stable employment. Likewise, if we ignore the efforts of the employed individual, employers are not encouraged to provide stable employment. Thus, we review the findings of fact concerning both Lennane's and his employer's efforts to preserve the employment relationship.

¶ 18    Here, Lennane made some efforts to preserve his employment. He "kept [his] employer informed of his physical health conditions," "notified his manager" that he "had difficulty performing installations due to the poor physical condition of his knees," and his doctor in 2017 "requested that [Lennane] not stand or walk for prolonged periods." He "asked his manager if there were other jobs, such as

administrative or clerical work, that . . . he could apply for or be placed." In 2017, he "took a [five] week leave of absence via the Family and Medical Leave Act . . . to rest his knees and seek additional medical intervention." He also "asked his manager, Randall Goodson, if he could only be assigned service calls due to the less strenuous nature of those jobs."

¶ 19    In response to Lennane's efforts, the employer made efforts to preserve the employment relationship. Lennane's manager "made attempts [after Lennane's request] to not dispatch [Lennane] on the most strenuous or large installations" and "would try to ensure that [Lennane] had another service technician available to assist him." The employer also "had administrative positions in Spartanburg, South Carolina and Knoxville, Tennessee," but not in North Carolina.

¶ 20    Ultimately, Lennane was unwilling to relocate from North Carolina for an administrative position and did not take additional Family and Medical Leave to treat his knees. Lennane subsequently resigned, working his last day on 16 November 2018.

¶ 21    Given the foregoing, his employer acted to preserve the employment relationship. The employer, at Lennane's request, provided Lennane the option to take an administrative position where the employer had administrative positions. The employer further made attempts to adjust the assignment of installations to be more favorable to Lennane given Lennane's request. Lennane also had choices other

than leaving his employment—choices he did not take. Lennane could have relocated from North Carolina for an administrative position with his employer, an option provided by his employer at his request, or he could have taken additional Family and Medical Leave to treat his knees as his employer previously supported. Prior to his leaving, Lennane also had continued to fully perform his duties and responsibilities.

¶ 22    For these reasons, *Ray* is easily distinguishable from this case. In *Ray*, the employer did not act to preserve the employment relationship: the supervisor refused the employee Ray's request to transfer to another department, denied her request for a protective mask, and threatened to terminate her employment if she conveyed her requests to the plant manager. 81 N.C. App. at 588. It is also "axiomatic that this Court is not bound by precedent of our Court of Appeals." *In re L.R.L.B.*, 377 N.C. 311, 2021-NCSC-49, ¶ 31 (cleaned up). Thus, we neither endorse nor dismiss *Ray*.

¶ 23    The Court of Appeals' decision in *Watson v. Employment Security Commission of North Carolina* is also not binding on this Court and is distinguishable. Unlike *Watson*, the employer in this matter did not relocate, and Lennane did not leave work because of unreliable transportation to work. *See* 111 N.C. App. at 415. Also, unlike this matter, the binding findings of fact in *Watson* reflected substantial attempts by the employee, Watson, to maintain the employment relationship. She expressed her concern to her employer about reliable transportation to and from work before the

relocation; she obtained some transportation from her supervisor; she used her own car until it broke down; and she made a series of other arrangements to get to work. *See id.* at 412. Watson did not leave work until she arrived late to work on account of her co-worker's truck being in disrepair, was sent home as a penalty for arriving late, believed the truck beyond repair, and had no other foreseeable means of transportation to and from work every day of her work week. *Id.* at 412. As a result, the Court of Appeals concluded that "[a]ll of the Commission's findings of fact make clear that petitioner desired, and attempted, to continue to work for respondent employer," such that "[h]er leaving work was solely the result [of the relocation of the plant by her employer]." *Id.* at 415. Given the binding findings of fact before us, we cannot conclude the same in this matter. Thus, we neither endorse nor dismiss *Watson v. Employment Security Commission of North Carolina* but conclude that it is not analogous to this case.[1]

¶ 24    Although Lennane left work for good cause as conceded by the Division, the legislature created unemployment insurance for a more limited subset of individuals: those who left work for "good cause attributable to the employer." N.C.G.S. § 96-14.5(a). Here, the employer made available to Lennane an administrative position as

---

[1] The dissent acknowledges that assessing attribution to the employer is highly fact-specific and relies on other cases that are factual distinct from the matter before us. Thus, further discussion of these cases from our lower courts would offer little (if any) additional clarity to our decision here.

Lennane specifically requested. The employer offered positions in all the locales where the employer had such positions. The employer, thus, acted. Lennane still left, but his employer's inaction did not cause Lennane's leaving. Lennane had made other requests to his employer, but an employer need not cede to every request of an individual employed by the employer to avoid having his inaction deemed the cause of an individual's leaving.

This Court's holding honors the limitation created by our legislature on unemployment benefits, consistent with the plain language of the statute and the legislature's express purpose of "encouraging employers to provide more stable employment" to prevent the spread of involuntary unemployment. N.C.G.S. § 96-2. "[T]he actual words of the legislature are the clearest manifestation of its intent, [so] we give every word of the statute effect, presuming that the legislature carefully chose each word used." *N.C. Dep't of Corr. v. N.C. Med. Bd.*, 363 N.C. 189, 201 (2009). This Court in *In re Watson* explained:

> In [N.C.]G.S. [§] 96-14(1) it is provided that one is disqualified from receiving benefits under the act if he left work voluntarily "without good cause attributable to the employer." The disqualification imposed in [N.C.]G.S. [§] 96-14(3) for failure to accept suitable work "without good cause" does not carry the qualifying phrase "attributable to the employer." It cannot be presumed that the omission of these qualifying words was an oversight on the part of the Legislature. Thus, the "good cause" for rejection of tendered employment need not be a cause attributable to the employer.

273 N.C. at 635.

Decades later, the legislature still does not omit the statutory language "attributable to the employer" for individuals leaving work: "[a]n individual is disqualified for any remaining benefits if the Division determines that the individual has failed, without good cause, to . . . [a]ccept suitable work when offered," N.C.G.S. § 96-14.11(b), but "disqualified from receiving benefits if the Division determines that the individual left work for a reason other than good cause *attributable to the employer*," N.C.G.S.§ 96-14.5(a) (emphasis added). Thus, we decline to create insurance paid for by employers for unemployment not attributable to an employer's actions or inactions.

## IV.   Conclusion

Unemployment insurance does not provide benefits to individuals who "left work for a reason other than good cause attributable to the employer." N.C.G.S. § 96-14.5(a). While Lennane, as conceded by the parties, left work for good cause, he has failed to satisfy his burden to show that his leaving work was "attributable to the employer" as a matter of law. *Id.* Accordingly, we affirm the Court of Appeals' decision.

AFFIRMED.

Justice EARLS dissenting.

Both Mr. Lennane and the Employment Security Division agreed that Mr. Lennane's reason for leaving his job, after having worked for ADT as a service technician for over six and a half years, **w**as for "good cause" as defined by law. Indeed, respondent acknowledged to the court below that "[t]he Petitioner's reason for resigning was the personal knee issues, and the Division's Findings of Fact support the conclusion it was for 'good cause.' " Where, as the dissent below noted, "[r]espondent concedes [petitioner] had good cause to resign," *In re Lennane*, 274 N.C. App. 367, 373 (2020) (Inman, J., dissenting), the only issue for this Court is whether Mr. Lennane has met his burden of establishing that the good cause was attributable to his employer. Here the majority observes that the Division conceded good cause, but then illogically concludes that Mr. Lennane failed to establish a "casual link" to explain why he left work. The majority then imposes a newly crafted "efforts to preserve the employment relationship" test and infers from the absence of factual findings that in fact, Mr. Lennane did not have good cause to leave his employment because he refused to leave North Carolina for Spartanburg, South Carolina or Knoxville, Tennessee and did not take additional Family and Medical Leave. These are all, in essence, arguments that he did not have good cause to leave his employment.

The appeals referee's factual findings here do not suggest that ADT offered Mr. Lennane service calls that would comply with his medical restrictions at the time rather than installation work. Based on the findings of fact, "[t]he claimant's manager denied the claimant's request [only to be assigned service rather than installation calls] because he needed to keep a fair balance of work distribution among all of the service technicians." In these circumstances, the decision not to offer Mr. Lennane work that he could perform safely is what led to the good cause for his need to stop working. Mr. Lennane carried his burden of demonstrating that the good cause for his leaving was attributable to a decision of the employer. He should not be disqualified from receiving unemployment benefits. Therefore, I dissent.

Although our task here is to determine whether the Division's findings of fact support its legal conclusions, the majority begins with an examination of the public policy behind the General Assembly's establishment of unemployment compensation. Ironically, the legislature's declared policy actually supports the conclusion that ADT did not do enough here to keep Mr. Lennane on its payroll with work that he could safely perform given his health condition, rather than the majority's conclusion that Mr. Lennane should have moved out of state to work in an administrative position or take unpaid leave. According to the 1936 statute, economic security in North Carolina is promoted by "encouraging employers to provide more stable employment." N.C.G.S. § 96-2 (2021) (carrying forward the original statutory language). Moreover, "the

public good and the general welfare of the citizens of this State require . . . the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own." *Id.* The statute is intended to protect North Carolina workers and to encourage employers to provide stable employment.

¶ 31 Whatever the policy implications, the more specific language of the statute's disqualification provision applies here. *See In re Steelman,* 219 N.C. 306, 310-11, (1941) (the general designation of workers selected for benefits being those who are "unemployed through no fault of their own." is constrained by the more specific provisions of the statute if the provisions would otherwise conflict). This Court has found that "sections of the act imposing disqualifications for its benefits should be strictly construed in favor of the claimant and should not be enlarged by implication or by adding to one such disqualifying provision words found only in another." *In re Watson*, 273 N.C. 629, 639 (1968); *see also Marlow v. N.C. Emp. Sec. Comm'n*, 127 N.C. App. 734, 735 (1997) ("Further, in keeping with the legislative policy to reduce the threat posed by unemployment to the 'health, morals, and welfare of the people of this State,' statutory provisions allowing disqualification from benefits must be strictly construed in favor of granting claims." (quoting N.C.G.S. § 96-2 (1995)), *disc. rev. denied,* 347 N.C. 577 (1998); *Lancaster v. Black Mountain Ctr.*, 72 N.C. App. 136, 141 (1984) (same). It goes without saying that this Court should not be imposing new

disqualification rules that have no basis in the statute. *See* N.C.G.S. § 96-14.5.

'Good cause,' which was conceded here, is understood to be "a reason which would be deemed by reasonable men and women valid and not indicative of an unwillingness to work." *Carolina Power & Light Co. v. Emp. Sec. Comm'n of N. C.*, 363 N.C. 562, 565 (2009) (quoting *Intercraft Indus. Corp. v. Morrison*, 305 N.C. 373, 376 (1982)). Given that Mr. Lennane's reason for resigning was for "good cause," it is therefore clear that the facts do not support any conclusion that he resigned because he was unwilling to work. And yet, that is precisely what the majority ultimately concludes, that Mr. Lennane had "other choices" but chose not to keep working. The majority's conclusion is not supported by the factual findings in this case.

If the separation is "produced, caused, created or as a result of actions by the employer," it is attributable to the employer. *Id.* (quoting *Couch v. N.C. Emp. Sec. Comm'n*, 89 N.C. App. 408 at 409-10, *aff'd per curiam,* 323 N.C. 472 (1988)). Inaction by the employer also can provide good cause to leave a job. *See, e.g., Ray v. Broyhill Furniture Indus.*, 81 N.C. App. 586, 592–93 (1986) (attributing a supervisor's failure to put in a transfer request on behalf of an employee to a department with fewer health risks as one of the bases of good cause for the employee's departure). Good cause is attributable to the employer where circumstances caused by the employer "make continued work logistically impractical" or "when the work or work environment itself is intolerable." *Carolina Power,* 363 N.C. at 567–68.

¶ 34    Examples of good cause attributable to employers when they create circumstances that make work logistically impractical for the employee are instructive. In *Barnes v. Singer Co.*, the employee quit after her employer relocated her job and she did not have reliable transportation to her new place of employment. 324 N.C. 213, 214, 216–17 (1989). In *Couch v. North Carolina Employment Security Commission*, a woman who quit her job after her employer unilaterally and substantially reduced her working hours was not disqualified from receiving unemployment benefits. 89 N.C. App. 405, 412, *aff'd per curiam,* 323 N.C. 472 (1988). In *Couch,* the Court of Appeals remanded the case to determine whether the decrease of two hours per day of work was substantial enough to constitute good cause. *Id.* at 408, 412–13. In *Milliken & Co. v. Griffin*, the Court of Appeals found good cause attributable to the employer when Ms. Griffin quit after her employer failed to heed her doctor's advice that she receive work that did not aggravate her muscle spasms or be assigned shorter shift hours. 65 N.C. App. 492, 497 (1982), *disc. rev. denied*, 311 N.C. 402 (1984). The Court of Appeals based its decision on the fact that Ms. Griffin spoke to her manager about her health issues and desire for alternative work options within the company, ultimately found none and then resigned. *Id.* at 495.  None of these precedents are reversed by the Court's decision in this case.

¶ 35    Instead, whether good cause attributable to the employer exists is a highly fact-specific determination, for which Mr. Lennane bears the burden of proof.  The

fact to be decided here was not whether ADT or Mr. Lennane made the most effort to "preserve the employment relationship," but rather, who was responsible for the circumstances that led to Mr. Lennane resigning for good cause. It is most important to remember that this is not a fault-based inquiry, ADT may have had a very good business reason for not allowing Mr. Lennane to work only service calls. But in this particular workplace, it was ADT's decision to make, not Mr. Lennane's.

¶ 36 As the factual findings explain, ADT had previously divided its home security system service and installation departments. Despite Mr. Lennane's having been trained to do the more physically demanding job of installation work, he was still primarily a service technician. He had worked at this job for over six years by the time he quit, and four of those years were spent dealing with various knee injuries. The injury to his left knee happened while he was on the job, and despite undergoing knee surgery, he sustained a permanent partial disability in that knee. This injury and the subsequent limit on the full use of his left knee caused Mr. Lennane to favor his right knee, which led to him "experiencing regular pain in his right knee."

¶ 37 As his pain increased, Mr. Lennane also experienced a reshuffling of his duties at work when a merger caused ADT to combine its service and installation departments. The loss of that structural divide required service technicians to do installation work as well. There was conflicting testimony at the hearing regarding how much of an increase in installation work this created for Mr. Lennane, and the

findings of fact do not resolve that question.[1] But the appeals referee did find that Mr. Lennane "kept the employer informed of his physical health conditions" and that he "had difficulty performing installations due to the poor physical conditions of his knees, of which he notified his manager." He asked about two less strenuous work options: a desk job or forgoing installation work. Neither option was a realistic choice for him because the administrative work was only available out of state and the manager "needed to keep a fair balance of work distribution among all of the service technicians."

Mr. Lennane tried to continue with his job by taking a five-week FMLA leave of absence to heal, but that hiatus could not permanently fix the deterioration of his knees. His manager still would assign him installations while attempting to keep these jobs smaller or to assign a second service technician to assist him on large installations. Yet, these attempts were not enough because Mr. Lennane's doctor recommended that he not walk or stand for long periods.

---

[1] In the absence of detailed findings of fact regarding the effect on Mr. Lennane of the change in work assignments from only service work to a mix of service and installation work, despite testimony on this point, the majority erroneously concludes that therefore Mr. Lennane failed to establish a causal nexus between ADT's actions and his leaving work. Not only does this determination negate the concession that Mr. Lennane left for good cause, it also assumes that in the absence of factual findings, the employer's version of events must be correct. Mr. Lennane did testify about the causal nexus between ADT's inability to accommodate his need for limited walking and standing and his decision to resign. If there is testimony tending to prove a material fact but the absence of a related factual finding, it is not the role of this Court to make assumptions, draw contrary inferences, or make its own factual findings.

The findings of fact paint a vivid picture of someone who tried to hold on to his job despite chronic pain from a workplace injury, but who ultimately had good cause to leave. And the findings also present a picture of an employer that tried to accommodate his employees' bad knees in some fashion but who, for business reasons, failed to do so adequately. Just as in *Barnes*, in which the court concluded that materially moving an employee's job is good cause attributable to that employer, similarly here it should not be held against Mr. Lennane that ADT's only administrative work option was outside of North Carolina and that his manager's preference was to make an equal distribution of installation work among service technicians. ADT had less strenuous service work still available at Mr. Lennane's North Carolina location but chose not to let him focus only on that work. Given that the majority does not purport to overrule *Barnes,* but inexplicably decides not to rely on it, the principle established by this Court in *Barnes* remains good law, namely that: "[a]n employee does not leave work voluntarily when the termination is caused by events beyond the employee's control or when the acts of the employer caused the termination." *Barnes,* 324 N.C. at 216. There, an employer moving a plant eleven miles away to a location the employee could not commute to from her home, constituted good cause attributable to the employer. *Id.* In this case, requiring that Mr. Lennane move out of state to maintain employment that does not further damage his health similarly is holding him responsible for matters beyond his control. The

application of the law here is not about sympathy for an injured worker, it requires an analysis of whether the good cause, conceded by respondent, was due to factors within the employer's control.

¶ 40      Ultimately, Mr. Lennane's manager decided not to meet his medical needs by assigning only service work and, just as the employee in *Ray*, Mr. Lennane chose his health and had to quit. Unlike the situation in *Ray*, however, Mr. Lennane did pursue several avenues to try to keep his job. All of the steps taken by Mr. Lennane – keeping his employer informed of his health problems, requesting a transfer to office work, taking FMLA leave, and asking for lighter field assignments – show an employee trying to keep working. Indeed, Mr. Lennane's pursuit of reasonable remedial measures exceeded the efforts to preserve employment undertaken by employee Ray, who did not take FMLA leave. More importantly, as the unanimous court in *Ray* pointed out, "[s]peculation as to what [claimant] *could have done*" is irrelevant. *Ray*, 81 N.C. App. at 592. (emphasis in original).

¶ 41      Mr. Lennane was in an even more compelling circumstance than the successful claimant in *Ray*. Mr. Lennane acquired his underlying health problems on the job. The findings of fact make clear that his health concerns arose from job requirements that had changed since his hire, even if the magnitude of that change is not specified. Mr. Lennane was a "person who must quit a job for health reasons but who is available for other employment," and therefore, "reason and justice demand that such

a claimant receive unemployment benefits." *Griffin*, 65 N.C. App. at 497. Indeed, the

logic of the Court of Appeals' decision in *Griffin* is compelling here, because in that

case the very policy cited by the majority here was the basis of the Court of Appeals'

conclusion that an employee whose health condition leads to unemployment is

entitled to receive unemployment benefits:

> Milliken would have us follow those jurisdictions which have denied benefits to individuals who became unemployed because of sickness, accident or old age. . . . We find that the language in the *Mills* decision is in conflict with the policy behind North Carolina's Employment Security Act and application of the Act. The *Mills* court concluded that "involuntary unemployment" under the Act meant unemployment resulting from a failure of industry to provide stable employment; and that unemployment due to changes in personal conditions to the employee, which made it impossible for him to continue his job, was not the type covered by the Act. Our Legislature did not intend such a narrow application of the Act when it declared the following public policy to be accomplished by the Act: "[T]he public good and the general welfare of the citizens of this State require the enactment of this measure . . . for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own." G.S. § 96-2.

*Id.*, at 497-98 (second and third alternations in original) (internal citations omitted).

Both *Ray* and *Griffin* remain good law. The majority does not dispute the logic or

reasoning of either decision. Instead, the majority finds a significant distinction that

in *Ray* the employer "did not act to preserve the employment relationship" because

Ray's supervisor denied a transfer request and refused to provide a protective mask.

Even if denying a transfer request differs significantly from offering a transfer that requires moving out of state while denying limited work assignments at the current worksite, the ultimate question is who has created the condition under which continued employment is not possible. Based on the factual findings in this case, the relevant business decisions were made by ADT. Mr. Lennane wanted to work, he just could not continue to put too much strain on his knees by installing security systems.

¶ 42       The majority also goes beyond the findings of fact in assuming that Mr. Lennane could have continued to perform installation work for ADT so long as he periodically took FMLA leave to rest his knees.  While there was some testimony in the record from Mr. Lennane concerning how frequently he already was resting his knees to no lasting effect, the assumption made by the majority is not in the appeals referee's findings of fact. We do not know from this record whether such leave would have been paid or unpaid, or even if it would have addressed the medical problem. On the record before us, Mr. Lennane left his job for good cause, namely, personal health or medical reasons, in circumstances in which his employer did have work that he could have performed, specifically service calls rather than installation work, but chose not to give him the option of doing that work. Mr. Lennane's good cause for leaving work was attributable to ADT, and he should not be disqualified from receiving unemployment benefits.

Justices HUDSON and ERVIN join in this dissenting opinion.